DOUGLAS PAUL HUOT *vs.* COMMONWEALTH.

Suffolk.    December 7, 1972. — February 13, 1973.

Present: TAURO, C.J., BRAUCHER, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Practice, Criminal,* Plea, Assistance of counsel. *Constitutional Law,* Due process of law.

A defendant charged with first degree murder, whose attorney, after hearing the very strong case of the prosecution, advised him of "all the possibilities" and ascertained that his subsequent plea of guilty of second degree murder was entered "knowingly and voluntarily," was not denied the effective assistance of counsel. [98]

A defendant charged with first degree murder who, after hearing the prosecution's very strong case, the forceful advice of an attorney to plea bargain, and the thorough advice of his trial counsel as to his options, pleaded guilty to second degree murder, was not so terrorized that his plea was not voluntarily and intelligently entered. [98–99]

In a murder case tried prior to *Boykin* v. *Alabama*, 395 U. S. 238, a defendant, who, after hearing the prosecution's very strong case, conceded his responsibility for the homicide and stated that he realized the severity of the offence and the nature of the sentence, voluntarily and intelligently pleaded guilty to second degree murder. [99–102]

PETITION for a writ of error filed in the Supreme Judicial Court for the county of Suffolk on March 24, 1970.

The case was reserved and reported by *Cutter, J.*

*William P. Homans, Jr.* (*Thomas G. Shapiro* with him) for the petitioner.

*Edward W. Kirk,* Deputy Assistant Attorney General (*John T. Gaffney,* Assistant District Attorney, with him) for the Commonwealth.

TAURO, C.J.    The petitioner (Huot) pleaded guilty to so much of an indictment for murder in the first degree

as charged him with murder in the second degree. Huot was sentenced to life imprisonment and, by this petition for a writ of error, he now contests the constitutional validity of his plea. After a hearing on the petition a single justice of this court affirmed the judgment and filed a reservation and report of his findings (which are not in dispute), his rulings and the question of law presented by the petition. We are asked to decide "Whether the petitioner's plea of guilty was so made and accepted that the imposition of judgment and sentence was in violation of any right of the petitioner to due process of law under the Fourteenth Amendment to the Constitution of the United States?"

On February 10, 1967, Huot was indicted for the first degree murder of one Betty Jeanne Orrill in which he pleaded not guilty. He was brought to trial on July 11, 1967. The Commonwealth proceeded to present evidence, and by July 19, 1967, the Commonwealth's case was substantially completed. On that day, after discussion with a lawyer, one Mr. Robert M. Murphy, and his own trial attorney Mr. Albert L. Hutton, Jr., Huot changed his plea to guilty to so much of the indictment as charged second degree murder. He was then sentenced to life imprisonment.

The petition for writ of error alleges, in substance, that Huot's plea of guilty to second degree murder was not knowingly and voluntarily made but was the result of coercion and terror. The single justice heard testimony from Huot and his trial counsel and concluded that "Huot's plea was voluntary, was made after reasonable inquiry by the judge, and is subject to no constitutional infirmity." We agree.

We summarize the findings of the single justice which were based upon his review of substantial portions of the trial transcript and upon testimony given by Mr. Hutton and Huot at the hearing before him. Huot had "dated" the victim ten or twelve times before her death. On the evening of the murder, the victim and two of her friends had eaten supper with Huot who drank considerably

throughout the evening. The group then went to the Playboy Club where Huot had at least seven Manhattan cocktails. Huot and the victim had an argument and left the club at approximately 12:30 A.M. About 4:40 A.M. the police, responding to a telephone call from Huot, found him in the bedroom of the victim's apartment "nude from the waist down" trying to resuscitate the girl.[1] The medical examiner testified that there were substantial brutal injuries to the victim.[2] There was evidence permitting an inference that Huot had tried to wash blood from the victim's and his own clothes. A recent room-mate of Huot's testified that Huot had said that he would "beat the hell out of . . . [the victim]" if she continued to resist his sexual advances.

From the evidence the single justice concluded that the "jury might well have decided that Huot had murdered the victim with extreme atrocity and cruelty" which would have justified a first degree murder conviction. A review of the transcript leads us to believe that the single justice's conclusion was correct.

---

[1] At the trial in the Superior Court, a police officer testified that Huot stated that he had gone out to get some cigarettes, that when he returned he decided he needed a shower and started to undress, but that he did not notice anything unusual until he went into the bedroom. However, Huot's trousers were found by the police officer in the bedroom on the upper bunk bed, and his underclothing was discovered in the bathtub. Another officer testified that he observed a large reddish spot on the floor about three or four feet in diameter. This red substance was subsequently identified as blood. The jury were shown photographs taken by a police officer in the victim's apartment depicting the petitioner's left shoe covered with blood, and with human hairs inside the shoe. A police chemist identified this hair as consistent with hairs from the victim's head.

[2] At the trial, the medical examiner stated that he had seen blood stains spattered over the living room floor of the victim's apartment shortly after her death. He explained the significance of a series of photographs that had been taken during the course of the autopsy which he carried out. He pointed out bruises on the victims' hips, wrists, hands, arms, thighs and knees, dried blood covering the nostrils and swollen and lacerated lips, blood in the ear canal, two black eyes and a torn left upper eyelid. He testified that the autopsy had revealed blood between the skull and the scalp, and that the skull had been injured numerous times and was fractured. The diagnosis of the cause of death was stated to be "multiple blunt-force injuries, with fracture of the skull or cerebral contusions and a subdural hemotoma." The medical examiner stated that in his opinion many of the injuries were caused by hard punches or kicks with a shod foot.

After Huot was arrested he consulted with Mr. Murphy who then referred the case to Mr. Hutton who acted as trial counsel. Mr. Murphy was not present at the trial until the day the plea of guilty was made. The single justice found that Mr. Hutton was an experienced trial attorney and that he had ample time to prepare the defence.

Prior to pleading guilty, Huot (after hearing the Commonwealth's evidence against him) had a conversation with Mr. Murphy and Mr. Hutton. Mr. Murphy told Huot that the case was going very unfavorably and that the jury would "fry his ass." Mr. Hutton concurred with the substance of Mr. Murphy's assessment that the case was going very badly. Huot testified that Mr. Murphy had told him that the jury "wanted . . . [his] blood," that he was "going to die if . . . [he] took the stand" and that he would "burn" if he did not change his plea. When asked what Mr. Murphy had said to him, however, Huot replied, "He [Mr. Murphy] said you have to plead guilty. I didn't believe it. I wanted to see Mr. Hutton."

Mr. Hutton spoke with his client. He explained the consequences of the various pleas and verdicts but did not advise Huot to plead guilty. After talking with Mr. Hutton, Huot, who had previously protested his innocence, then asked Mr. Hutton if the district attorney would accept a plea of guilty to second degree murder. Mr. Hutton conferred with the trial judge and the district attorney and then formally addressed the trial judge and requested the court to accept Huot's plea of guilty to second degree murder. He stated to the trial judge that Huot remembered going to the Playboy Club and being with the deceased girl but that he had "spotty recall of . . . the balance of the evening." Mr. Hutton further stated to the trial judge that Huot did "remember enough of the facts — and he tells me — to know that he is the person responsible for this homicide."

Before accepting the plea, the trial judge addressed Huot. He asked him if he was aware of the severity of the offence, the seriousness of the sentence and what the

plea meant in terms of his future.   Huot replied affirmatively to all questions.   When asked whether he had been promised any favor in return for his guilty plea, Huot replied, "No." [3]   Huot then pleaded guilty to the charge of second degree murder and was sentenced.

The single justice of this court found that Mr. Hutton had not advised Huot to plead guilty but had pointed out all the possibilities and consequences of a guilty plea.   He found that a "reasonably deliberate conference between Huot and Mr. Hutton followed Mr. Murphy's colorful statements" and that Mr. Hutton had behaved in a "proper, wise, fair, and well reasoned" manner.

When Mr. Hutton testified before the single justice of this court he stated that "Huot had never admitted his guilt to me and, as a matter of fact never has."   Mr. Hutton went on to explain, however, that Huot "said words to the effect that it must have been him, but that he could not remember having committed the crime." [4] The single justice of this court did not fully accept this testimony and found that Mr. Hutton's statement before the trial judge, suggesting that Huot did remember

---

[3] Before accepting the plea, the trial judge asked Huot the following questions: THE JUDGE: "Before accepting such a plea I'd like to make inquiry of the defendant. Will you kindly rise, please?" THE JUDGE: "Mr. Huot, do you realize the severity of the offence here?" THE DEFENDANT: "Yes." THE JUDGE: "Do you realize the seriousness of the sentence relating to it?" THE DEFENDANT: "Yes, sir." THE JUDGE: "Have you been promised as to any favor that might be given in relation to the acceptance of such a plea?" THE DEFENDANT: "No." THE JUDGE: "You realize what this means, so far as your future is concerned?" THE DEFENDANT: "Yes." THE JUDGE: "You do?" THE DEFENDANT: "Yes." THE JUDGE: "All right. Then the Court is ready to accept the recommendation or the request of counsel here and will accept the plea of so much of the indictment as charges the crime of Murder in the Second Degree. You may so accept the plea."

[4] Huot's memory of the events may well have been obscured in view of the amount of liquor he imbibed. Lack of direct memory of the events, however, would not necessarily indicate that Huot's plea was involuntary. Huot had heard the Commonwealth's case against him. From this he may well have concluded in his own mind that the most sensible course for him to follow was to plead guilty to second degree murder. Thus, on the basis of the evidence presented, Huot's guilty plea may well have been the result of his own rational choice. "An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." *North Carolina* v. *Alford,* 400 U. S. 25, 37.

enough of the facts to conclude that he was responsible for the homicide, was more likely to be accurate than his testimony before the single justice which occurred four years after the plea.

Huot also testified before the single justice. In spite of his statement that after he had talked with Mr. Murphy his "state of mind . . . was that there was no choice," so that he "gave in," the single justice found that Huot's plea was his own reluctant choice. He found that Mr. Hutton had given "reasonable, dispassionate advice in good faith, justified by the case which had been presented by the Commonwealth." He also found that the trial judge had "in good faith and reasonably concluded that . . . [Huot's] plea was voluntarily made," and that there was not the "slightest evidence that Huot's plea was in any way whatsoever induced by the judge or any representative of the Commonwealth."

The petitioner maintains that his guilty plea was not made voluntarily but was the result of coercion and terror. It is elementary that a guilty plea is void if it is involuntary and unintelligent for any reason. See, e.g., *Bram* v. *United States,* 168 U. S. 532, 542–543; *Kercheval* v. *United States,* 274 U. S. 220, 223; *Machibroda* v. *United States,* 368 U. S. 487, 493; *Malloy* v. *Hogan,* 378 U. S. 1, 8. Coercion that results in an involuntary plea will render the plea void as in violation of due process under the Fifth and Fourteenth Amendments. See, e.g., *Chambers* v. *Florida,* 309 U. S. 227, 235–238; *Walker* v. *Johnston,* 312 U. S. 275, 286; *Waley* v. *Johnston,* 316 U. S .101, 104; *Machibroda* v. *United States,* 368 U. S. 487, 493; *Brady* v. *United States,* 397 U. S. 742, 748.

The petitioner argues that Mr. Murphy's statements so terrorized him that his subsequent guilty plea was not made voluntarily.[5] Throughout the petitioner's brief Mr. Murphy is characterized as "one of the attorneys

---

[5] On the other hand it could be argued with logic that Huot may have been "terrorized" by the evidence introduced against him. Such "terror" would be a rational response to hearing the Commonwealth's damaging evidence which strongly pointed to the petitioner as the perpetrator of this crime.

representing the petitioner at the time of the plea" (at 4, 5). The single justice found that after Huot's arrest, an appearance was entered for him by Mr. Murphy, but that Mr. Hutton acted as Huot's trial counsel. From this finding and from the fact that Mr. Murphy does not appear to have assisted either in the preparation of the defence or at the trial, the Commonwealth argues that Mr. Murphy was acting in the capacity of "a friend of Huot." Regardless of this and in light of the fact that Huot sought Mr. Hutton's advice before deciding to enter his plea, it could reasonably be concluded that Huot looked upon Mr. Hutton as his attorney. But Mr. Murphy's status is not determinative here since in whatever capacity Mr. Murphy offered his advice, we believe that the single justice correctly found that his advice to Huot to plead guilty did not result in an involuntary plea.

The petitioner relies heavily upon *Colson* v. *Smith*, 438 F. 2d 1075 (5th Cir.), to support the view that his plea was involuntary. In that case, the court set aside Colson's conviction because "counsel actively tried to convince petitioner to plead guilty in the face of petitioner's repeated protestations of innocence" and that counsel had failed "to ascertain that his accused client's plea of guilty was voluntarily and understandingly made." The court was careful to note, however, that "there was no evidence that counsel's advice to plead guilty was based on any evaluation of petitioner's chances had he gone to trial." *Id.* at 1081.

In the case before us Mr. Murphy's advice to plead guilty was given after the prosecution had presented a very strong case from which the single justice reasonably concluded that "there was a very serious risk of a first degree conviction." The *Colson* case, *supra*, is thus clearly distinguishable since, in the instant case, the advice to Huot was given in light of a very strong case against him. Moreover, Mr. Hutton did not advise his client to plead guilty and was careful to ascertain that Huot, after hearing the evidence, considered himself responsible for the homicide. Only after hearing the Com-

monwealth's case and consulting with his client did Mr. Hutton ask the judge to accept a guilty plea to second degree murder.

In so far as Huot's claim appears to allude to the denial of effective assistance of counsel, we believe that the single justice found correctly that Mr. Hutton had advised Huot competently and had properly ascertained that Huot's plea was entered knowingly and voluntarily. This was the extent of the scope of Mr. Hutton's duty to his client in rendering advice on the entry of the plea. See *Von Moltke* v. *Gillies*, 332 U. S. 708, 721; *Lamb* v. *Beto*, 423 F. 2d 85, 87 (5th Cir.), cert. den. 400 U. S. 846; *Edwards* v. *United States*, 256 F. 2d 707, 709 (D. C. Cir.), cert. den. 358 U. S. 847.

Mr. Hutton's advice was not pleasant, but he had made the very reasonable assessment that the outcome of the case would be unfavorable and had not shirked his difficult duty of so advising his client.[6]   Mr. Hutton conferred with Huot both during and after the conversation between Mr. Murphy and Huot and it was not until Mr. Hutton had advised Huot of "all the possibilities" that the petitioner decided to change his plea.   Before the single justice, Mr. Hutton testified that he had asked Huot "whether he felt that he committed the crime, having in mind the state of the evidence . . . against him" and that Huot had "said words to the effect that it must have been him."   In view of this testimony and Mr. Hutton's statement to the trial judge that Huot remembered enough of the facts to know that he was responsible for the homicide, and was aware of the nature of the sentence, it appears that Mr. Hutton had reasonably ascertained that his client's plea was made knowingly and voluntarily.   We conclude, therefore, that any claim that counsel was ineffective is groundless.

We turn now to the argument that Huot was so gripped

---

[6] In *North Carolina* v. *Alford*, 400 U. S. 25, 27, 31, the defendant's attorney "[f]aced with strong evidence of guilt . . . recommended that he plead guilty."   This advice was characterized as given by "competent counsel."

by terror from Mr. Murphy's statements that any advice, competent or otherwise from Mr. Hutton, could not dissipate the coercion used to produce the guilty plea. The petitioner argues that in the totality of the circumstances of the case, he cannot be considered to have made a voluntary plea especially since he never admitted that he committed the crime. We disagree. The mere fact that Huot professed innocence, or was unwilling or unable to admit his participation in the killing, would not alone invalidate the guilty plea. *North Carolina* v. *Alford,* 400 U. S. 25, 36–37. It is true that Mr. Murphy had forcefully tried to persuade Huot to plead guilty but he had been unsuccessful. It was only after Mr. Hutton explained that the case was going badly that Huot himself asked whether a plea of guilty to second degree murder might be accepted. In so far as Mr. Murphy's remarks to the petitioner may have tended to persuade him to plead guilty against his will, such persuasion was dissipated by the subsequent competent advice of Mr. Hutton. *Brady* v. *United States,* 397 U. S. 742, 754. See *Miranda* v. *Arizona,* 384 U. S. 436, 466. Huot, who had heard the evidence against him, responded to Mr. Hutton's reasonable advice by deciding to plead guilty to a lesser included charge.

The petitioner also argues that his plea should be set aside because the Commonwealth has not shown that the plea was entered voluntarily and intelligently. *Boykin* v. *Alabama,* 395 U. S. 238, decided on June 2, 1969, has established that the record of a guilty plea entered subsequent to that decision is required to disclose affirmatively that a defendant who pleads guilty entered his plea understandingly and voluntarily. (Discussed in *Brady* v. *United States,* 397 U. S. 742, 747–748, n. 4.) In order to comply with constitutional requirements, the burden of showing the voluntary and intelligent nature of post-*Boykin* guilty pleas is placed upon the State.

There is currently much dispute over the precise scope of this requirement: Whether, for example, the record must affirmatively disclose exact compliance by the trial

judge with a procedure similar to that required by Rule 11 of the Federal Rules of Criminal Procedure, 18 U. S. C. Appendix (1970), or whether the State can establish a record during post-conviction review. *Commonwealth* v. *Godfrey*, 434 Pa. 532 (majority opinion), but cf. 434 Pa. 538 (concurring opinion of Roberts, J.). *People* v. *Jaworski*, 387 Mich. 21, revg. 25 Mich. App. 540, but cf. *Morgan* v. *State*, 287 Atl. 2d 592 (Maine).

As the defendant concedes, however, the requirements of the *Boykin* case are not to be retroactively applied. See *Halliday* v. *United States*, 394 U. S. 831, 833; *Andrews* v. *Commonwealth*, 361 Mass. 722, 726, and cases cited in note 2. Whether the record before us meets all the *Boykin* case requirements is not, therefore, determinative since Huot's guilty plea was made on June 19, 1967, before the effective date of the *Boykin* decision.

In a recent decision we held that the petitioner has the burden of proving error, at least as far as pre-*Boykin* pleas are concerned. *Andrews* v. *Commonwealth, supra,* at 726. But even if the Commonwealth were required to satisfy the burden of proof, we think that the testimony before the single justice (Mr. Hutton's statement to the trial judge that Huot had, in effect, conceded his responsibility for the homicide, and Huot's admission that he realized the severity of the offence and the nature of the sentence) is sufficient to demonstrate a voluntary and knowing plea under standards recognized prior to the *Boykin* case.

It is also argued that the judge's questioning of the defendant was inadequate in that he did not ask whether the plea was voluntary. It is true that the United States Supreme Court has recently enunciated careful guidelines for Federal Courts (and possibly for State courts, see discussion, *supra*) with respect to the inquiry that the trial judge must make of the defendant to ensure that a guilty plea is knowingly and voluntarily made. The court must ensure that the guilty plea has been made with an understanding of the nature of the charge and

the consequences of the plea. The plea will not be considered voluntary unless "the defendant possesses an understanding of the law in relation to the facts." *McCarthy* v. *United States*, 394 U. S. 459, 464–467. *Boykin* v. *Alabama*, 395 U. S. 238. But these decisions are not considered retroactive. See *Halliday* v. *United States*, 394 U. S. 831. For the reasons previously outlined, we believe that the record before us sufficiently demonstrates that Huot's pre-*Boykin* plea was made knowingly and was not coerced.

This case does not present a situation where the plea of guilty was entered before trial. In considering whether the guilty plea was voluntary and knowingly made, the trial judge could give due consideration and weight to the fact that the plea was offered after the Commonwealth's case had been presented. Both the judge and the petitioner had heard detailed and concurring evidence of the petitioner's guilt.

The petitioner further argues that his guilty plea was not only involuntary but also unintelligent in that it was not shown that he knowingly waived his privilege against self-incrimination. It is clear that the *Boykin* case indicated that when a plea of guilty is entered in a State criminal trial, three Federal constitutional rights are waived; namely, the privilege against self-incrimination, the right to trial by jury and the right to confront one's accusers. 395 U. S. at 243. It has not yet been finally decided if State court judges must specifically inquire whether a defendant who pleads guilty after the *Boykin* decision understands that he is waiving these three rights. We think it would be better practice for the trial judge so to inquire. See *People* v. *Jaworski*, 387 Mich. 21, revg. 25 Mich. App. 540. As we stated before, however, the *Boykin* case is not to be considered as retroactive and therefore is not applicable to this case.

In conclusion, we think that the hearing before the single justice, which carefully reviewed the actions of Mr. Murphy, Mr. Hutton and the trial judge, established that

the petitioner's plea was entered voluntarily and was not in violation of any right of the petitioner to due process under the Fourteenth Amendment.

*Judgment affirmed.*